**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

RONALD KAPLOVE, Individually and on )
behalf of all others similarly situated, )
                                  )
              Plaintiff, )          Case No. 1:26-cv-03681
                                    )
       v. )
                                      )          **JURY TRIAL DEMANDED**
THE ALLSTATE CORPORATION, )
                                      )
                                      )
             Defendant. )

**CLASS ACTION COMPLAINT**

1.       Plaintiff Ronald Kaplove ("Plaintiff") brings this action to enforce the consumer-privacy provisions of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, a federal statute enacted in 1991 in response to widespread public outrage about the proliferation of intrusive, nuisance telemarketing practices. *See Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012).

2.       In violation of the TCPA, Allstate and/or third-parties acting on its behalf made telemarketing calls to Mr. Kaplove's residential telephone number for the purpose of advertising and encouraging the purchase of Allstate's goods and services, without prior express invitation or permission.

3.       Mr. Kaplove never consented to receive the calls. Because telemarketing campaigns generally place calls to thousands or even millions of potential customers en masse, Plaintiff brings this action on behalf of a proposed nationwide class of other persons who received illegal telemarketing calls from or on behalf of the Defendant.

4.       A class action is the best means of obtaining redress for the Defendant's wide-scale illegal telemarketing, and is consistent both with the private right of action afforded by the TCPA

1

248003

and the fairness and efficiency goals of Rule 23 of the Federal Rules of Civil Procedure.

5.      This is an action for injunctive relief, statutory damages, and actual damages based on these unlawful telephone solicitation calls (commonly referred to as "robocalls") that violated the TCPA.

## The Parties

6.      Ronald Kaplove is an individual residing in Parkland, Florida.

7.      The Allstate Corporation ("Allstate" or "Defendant") is a Delaware limited liability company with its corporate headquarters located in Northbrook, Illinois, which is located within this district.

## Jurisdiction And Venue

8.      The Court has federal question subject matter jurisdiction over these TCPA claims. *Mims v. Arrow Financial Services, LLC*, 565 U.S. 368 (2012).

9.      The events described herein relate to unlawful telemarketing calls to Plaintiff's residential telephone number.

10.      Venue is appropriate in this district pursuant to 28 U.S. Code § 1391(b)(1) as Defendant is headquartered and does business within this District.

## The Telephone Consumer Protection Act

11.      "Americans passionately disagree about many things.  But they are largely united in their disdain for robocalls."  *Barr v. Am. Ass'n of Political Consultants*, 591 U.S. 610, 613 (2020).

12.      In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry. In so doing, Congress recognized that "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy[.]" Telephone Consumer Protection Act of 1991, Pub. L.

2

248003

No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

**The TCPA Prohibits Calling Numbers after a Stop Request and Prohibits Calling Numbers on the National Do Not Call Registry**

13.     Section 227(c) of the TCPA requires the Federal Communications Commission ("FCC") to implement regulations "concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1).

14.     Pursuant to that instruction, the FCC has implemented the following rule: "Persons or entities making calls for telemarketing purposes (or on whose behalf such calls are made) must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made. This period may not exceed thirty days from the date of such request." 47 C.F.R. § 64.1200(d)(3).

15.     The FCC also created the National Do-Not-Call Registry, which allows consumers to register their telephone numbers and thereby indicate their desire not to receive telephone solicitations at those numbers. *See* 47 C.F.R. § 64.1200(c)(2).

16.     A telephone number's registration on the Do-Not-Call Registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." *Id.*

17.     The TCPA and implementing regulations prohibit initiating telephone solicitations to any residential telephone subscriber's telephone number that is registered on the National Do-Not-Call Registry. *See* 47 C.F.R. § 64.1200(c)(2); 47 U.S.C. § 227(c)(5).

18.     The TCPA and implementing regulations provide a private cause of action to persons who receive more than one call "by or on behalf of the same entity" within any 12-month period in violation of these regulations. *See* 47 U.S.C. § 227(c)(5).

3

248003

**Sellers like Allstate Are Liable under the TCPA**

19.     The FCC has held that a company on whose behalf a telephone call is made bears the responsibility for any TCPA violations. *In re Rules Implementing the Tel. Consumer Prot. Act of 1991*, 23 FCC Rcd 559, 565 (¶ 10) (Jan. 4, 2008) (specifically recognizing "on behalf of" liability in the context of an autodialed or prerecorded message call sent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

20.     On May 9, 2013, the FCC released a Declaratory Ruling holding that a corporation or other entity that contracts-out its telephone marketing "may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In re DISH Network, LLC*, 28 FCC Rcd 6574, 6574 (¶ 1) (May 9, 2013).

21.     The May 2013 FCC Ruling held that, even absent evidence of a formal contractual relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls. *In re DISH Network, LLC*, 28 FCC Rcd at 6586 (¶ 34).

22.     The May 2013 FCC Ruling further clarifies some of the circumstances under which a telemarketer has apparent authority or a seller ratifies a telemarketer's unauthorized conduct:

> [A]pparent authority may be supported by evidence that the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information. The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mark may also be relevant. It may also be persuasive that the seller approved, wrote or reviewed the outside entity's telemarketing scripts. Finally, a seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on

4

the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.

*In re DISH Network, LLC*, 28 FCC Rcd at 6592 (¶ 46).

23. The FCC has rejected a narrow view of TCPA liability, including the notion that a seller's liability requires a finding of formal agency and immediate direction and control over the third-party who placed the telemarketing call. *In re DISH Network, LLC*, 28 FCC Rcd at 6587 n.107.

24. The FCC has confirmed that sellers such as Allstate may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "[s]ellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy."

*In re DISH Network, LLC*, 28 FCC Rcd at 6588 (¶ 37) (internal citations omitted).

## THE UNLAWFUL CONDUCT

25. Allstate authorizes its agencies (hereinafter, "Allstate agencies") to act as agents of Allstate for the purpose of soliciting, selling, and servicing Allstate insurance, and the Allstate agencies consent to so act.

26. Allstate agencies have Allstate's actual and apparent authority to appoint subagents for solicitation and telemarketing purposes.

27. Allstate agencies contractually agree to indemnify and be responsible to Allstate

5

248003

for any third-party subagents.

28.     Pursuant to direction and encouragement from Allstate, Allstate agencies appoint third-party telemarketing vendors as subagents to solicit people to purchase Allstate insurance.

29.     Specifically, Allstate agencies engage third-party telemarketing vendors to make telemarketing calls to generate "leads" to purchase Allstate insurance.

30.     The third-party vendors directed call centers to make telemarketing calls to generate the "leads" to purchase Allstate insurance.

31.     The lead-generation process involves making telemarketing calls, without prior express written consent, invitation or permission, to telephone numbers obtained from sources other than Allstate or Allstate agencies, for the purpose of advertising and encouraging the purchase of Allstate insurance.

32.     The illegal telemarketing calls are either live-transferred to an Allstate agency without ever ending the call (sometimes known as a "live transfer lead"), or the called party's contact information is provided to an Allstate agency for a callback (sometimes known as an "Internet" or "call verified lead").

33.     In both cases, the Allstate agencies accepted the live-transfer calls and the call-verified/Internet lead information, spoke to those consumers about purchasing Allstate insurance, and provided some of them quotes for Allstate insurance.

34.     Allstate and the Allstate agencies knowingly accepted business originated through the illegal telemarketing calls.

### The Calls and Communications With Plaintiff

35.     Plaintiff registered his residential telephone number (xxx) xxx-4308 on the National Do Not Call Registry in or around 2006.

6

248003

36.     Plaintiff's telephone number (xxx) xxx-4308 has at all times been used solely used for residential purposes and not any business purpose.

37.     Prior to December 31, 2025 Plaintiff received numerous calls from people holding themselves out as calling from Allstate, and he asked them to remove his number and not call anymore. The callers either agreed or disconnected the call, but the calls continued.

38.     On December 31, 2025, Plaintiff received a call on his residential telephone number (xxx) xxx-4308.

39.     At the outset of the call, there was a brief pause of dead air then a beep, at which point a live representative came on the line who held themselves out as calling from Allstate. Plaintiff asked who was calling, and the representative stated the call was on behalf of Allstate and after answering a few questions, Plaintiff was transferred to another person, "Joseph," who represented himself as working for Allstate and then transferred Plaintiff to Ms. Bondeson, an Allstate sales agent working out of Jupiter, Florida.

40.     Ms. Bondeson then texted Plaintiff from phone number 561-946-6960 with options to review insurance quotes.

41.     On December 31, 2025, Plaintiff sent a letter to Allstate Legal Department with the details of the above call(s) demanding immediate cessation of all calls to Plaintiff's phone number, (xxx) xxx-4308, and written confirmation of removal of Plaintiff's number from Allstate calling lists, agents, affiliates and third-party marketers.

42.     On January 22, 2026, Plaintiff received a call on his residential telephone number (xxx) xxx-4308 from or on behalf of Defendant.

43.     During the call, Plaintiff asked who was calling and a representative stated the call was from someone named "Jason," from Allstate.  Plaintiff instructed Jason to not call anymore

7

and stated he was on the Do-Not-Call Registry, and Jason hung up immediately.

44. Defendant again did not honor Plaintiff's do-not-call request. Instead, Plaintiff continued to receive telemarketing calls promoting Allstate's insurance quotes.

45. On February 3, 2026, Plaintiff received a call on his residential telephone number (xxx) xxx-4308 from someone named "Michael," from Allstate. Michael asked Plaintiff a few questions about vehicles and home, and was advised by Plaintiff of the Do-Not-Call Registry.

46. On February 3, 2026, Plaintiff sent an additional letter to Allstate addressed to the Chairman, CEO and President requesting the calls to stop. This second letter to Allstate provided the details of the above call(s), and demanded immediate cessation of all calls to Plaintiff's phone number, (xxx) xxx-4308, and written confirmation of removal of Plaintiff's number from Allstate calling lists, agents, affiliates and third-party marketers.

47. On February 4, 2026, Plaintiff received a letter from Allstate dated January 29, 2026 in response to his letter from December 31, 2025, which stated Allstate will reach out to the Allstate agent to stop the calls.

48. On February 6, 2026, Plaintiff received another call on his residential telephone number (xxx) xxx-4308 from someone named "Michael," from Allstate. Plaintiff again asked Michael to stop calling and stated he was on the Do-Not-Call Registry, and Michael hung up abruptly.

49. On February 19, 2026, Plaintiff received a call on his residential telephone number (xxx) xxx-4308 from someone named "Alice," from Allstate. "Alice" asked Plaintiff a series of questions about vehicles and home insurance and transferred him to "Tai," an Allstate agent with JC Prime Insurance in Pleasant, Ohio who discussed various options for insurance and provided Plaintiff with two direct phone numbers, 614-683-4755 and 614-420-2600, and hung up the call

8

when she realized Plaintiff was not interested in purchasing insurance.

50. Plaintiff contacted Kaitlyn from Allstate (from the letter of January 2026 to stop the illegal calls). Kaitlyn insisted on recording the call with Plaintiff but only she was allowed to record the call and would not talk with Plaintiff if he recorded the call. Plaintiff notified Kaitlyn it was not fair for only one party (Allstate) to record the current conversation, and Plaintiff continued to receive illegal calls.

51. On February 26, 2026, Plaintiff received a second letter from Allstate dated February 18, 2026 which also said it would reach out to the agent in question to stop the calls.

52. Unfortunately, after numerous requests to not be called, both verbally and in writing, calls from Allstate continue.

53. On February 27, 2026, Plaintiff received calls on his residential telephone number (xxx) xxx-4308 from a representative from Allstate who transferred Plaintiff to another person named "Joseph," and who then transferred Plaintiff to Allstate Insurance Agency DeRosa and DeCarolis Insurance Group, Palm Beach Gardens, FL. Plaintiff spoke to one agent at this Allstate Agency and proclaimed how frustrated he was at the barrage of calls and clear, willful violations of the Do-Not-Call Registry. The agent then transferred Plaintiff to another agent at the office named "Chris," who apologized for the calls and admitted that Allstate agents use various third-party lead generators and he would add Plaintiff's number to the Do-Not-Call Registry for Allstate and the third party company his agency uses. Chris told Plaintiff his agency used a company called Lead Ventures based out of Rochester, New York to call people for sales leads but other agents at Allstate likely use other lead generation companies.

54. Yet the calls continued throughout March 2026.

55. On March 20, 2026, Plaintiff received a call on his residential telephone number

9

(xxx) xxx-4308 from someone named "James" from Allstate, who first claimed to be a licensed insurance agent and then claimed to be working for a licensed insurance agent from Allstate. Plaintiff asked the name of the licensed agent numerous times, and "James" terminated the call.

56. On March 24, 2026, Plaintiff received a missed call on his residential telephone number (xxx) xxx-4308 from the Jacob Aljaua Allstate Agency in Miami. Since Plaintiff was not able to answer the call, a text message was sent from the Jacob Aljaua Allstate Agency from "Melissa" to his residential phone number (xxx) xxx-4308 offering information on Allstate insurance products.

## ALLSTATE'S LIABILITY

57. Allstate is extensively involved in the operations of Allstate agencies.

58. Allstate requires Allstate agencies to follow detailed standards.

59. Allstate sets the standards Allstate agencies must follow.

60. Allstate has the ability, at any time without prior notice to Allstate agencies, to change the standards Allstate agencies must follow.

61. From time to time, Allstate changes the standards Allstate agencies must follow.

62. Allstate has the right to monitor the Allstate agencies' compliance with Allstate's standards and terminate the agency relationship for noncompliance.

63. Allstate sets new customer growth targets for Allstate agencies.

64. Allstate monitored and periodically assessed the Allstate agencies' performance.

65. Allstate authorized, advised, and encouraged Allstate agencies to use third-party vendors to generate "leads" to purchase Allstate insurance policies, including by making telemarketing calls.

66. It was common for Allstate to discuss third-party lead vendors during meetings with

10

Allstate agencies.

67.     Allstate recommended to Allstate agencies that they engage third-party vendors to make telemarketing calls to generate leads.

68.     Allstate helped Allstate agencies identify and engage third-party lead vendors.

69.     The Allstate Lead Marketplace is an online platform through which Allstate agencies purchase lead-generation services from third-party telemarketing vendors.

70.     Allstate promoted the Allstate Lead Marketplace program to Allstate agencies.

71.     Allstate set up meetings between Allstate agencies and third-party telemarketing vendors for the vendors to pitch their services.  Allstate invited Allstate agencies to attend those meetings, and Allstate participated in those meetings.

72.     During those meetings, third-party telemarketing vendors spoke about their lead-generation services and explained their telemarketing process, including that it would involve making calls to solicit people to purchase Allstate insurance.

73.     Plaintiff's lawsuit is not the first lawsuit seeking redress for telemarketing calls about Allstate insurance that were placed pursuant to lead-generation agreements.

74.     Before this lawsuit was filed, there were several class actions against Allstate alleging violations of the TCPA based on telemarketing calls promoting Allstate insurance that were placed pursuant to a lead-generation agreement.

75.     Those lawsuits involved other lead generators, but the process and the issues are the same as in this case.

76.     Allstate settled several of these class actions for millions of dollars, but Allstate did not discipline the Allstate agencies that were involved, and did not request or recommend that the Allstate agencies end their relationship with lead generators.

11

248003

77. Allstate helps finance Allstate agencies' use of third-party telemarketing vendors.

78. Allstate knew Allstate agencies were using third-party vendors to make telemarketing calls to generate leads to purchase Allstate insurance.

79. Allstate and the Allstate agencies knew the lead-generation process involved third-party vendors making (or causing others to make) telephone calls to solicit people to purchase Allstate insurance.

80. Allstate and the Allstate agencies knew those telemarketing calls were being made to telephone numbers on the National Do Not Call Registry.

81. The Allstate agencies maintained interim control over the third-party telemarketing vendors' and the call centers' actions.

82. The Allstate agencies specified to the third-party telemarketing vendors the geographic parameters for the leads they could telemarket to, the specific type(s) of Allstate insurance to promote, the number of leads to generate, and the times in which to call.

83. The Allstate agencies instructed the vendors whether to provide the lead's contact information to the agency for a callback, or transfer the calls "live" to the agency and to what specific telephone number(s).

84. The Allstate agencies had the right to terminate their relationships with the third-party telemarketing vendors.

85. The Allstate agencies had the ability to make interim changes to the call specifications.

86. The Allstate agencies changed various call specifications from time to time.

87. The third-party telemarketing vendors passed the Allstate agencies' call specifications down the chain to the call centers they directed to place the calls, and the call centers

12

complied.

88. The Allstate agencies maintained ultimate discretion about whether to accept any given lead from the third-party vendors and whether to provide a lead a quote for Allstate insurance.

89. Allstate insurance policies were sold to leads generated by the illegal telemarketing calls, thereby enlarging Allstate's customer base, and insurance premiums were collected for those insurance policies.

90. When an Allstate agency sells an Allstate insurance policy and a premium is collected on that policy, Allstate receives a portion of the premium and the Allstate agency receives a portion of the premium.

## CLASS ALLEGATIONS

91. As authorized by Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of the following classes of all other persons or entities similarly situated throughout the United States.

92. The classes of persons Plaintiff proposes to represent are tentatively defined, subject to amendment, as follows:

### Do Not Call Registry Class

Each person in the United States to whose (1) non-commercial telephone number (2) Defendant or anyone acting on Defendant's behalf initiated two or more telephone solicitations during a 12-month period; (3) promoting Defendant's products or services for sale (4) where the person's telephone number was registered on the National Do Not Call Registry more than thirty-one days before the telephone solicitations; (5) at any time from four years before the date this

13

248003

Complaint was filed through trial.

## Stop Request Class

Each person in the United States to whose (1) non-commercial telephone number (2) Defendant or anyone acting on Defendant's behalf initiated two or more telephone solicitations during a 12-month period (3) promoting Defendant's products or services for sale (4) after receipt of a do not call request (5) at any time from four years before the date this Complaint was filed through trial.

93.     Upon information and belief, the members of the classes received at least two telephone solicitations without having given prior express invitation or permission.

94.     The classes defined above are identifiable through phone records, phone number databases, and business records.

95.     The potential class members number at least in the thousands, since automated telemarketing campaigns make calls to hundreds or thousands of individuals per day. Individual joinder of these persons is impracticable.

96.     Plaintiff is a member of the proposed classes.

97.     There are questions of law and fact common to Plaintiff and to the proposed classes, including but not limited to the following:

   a)   Whether Defendant violated the TCPA;

   b)   Whether the calls constitute telephone solicitations;

   c)   Whether the calls were for purposes of advertising their goods and services of Allstate's insurance quotes;

14

248003

d)  Whether Defendant and/or any third-parties who placed the calls on Defendant's behalf instituted procedures for maintaining an internal do-not-call list of persons who requested not to receive telemarketing calls by or on behalf of that person or entity;

e)  Whether the conduct of Defendant and/or any third-parties who placed the calls was knowing and/or willful;

f)  Whether any third-parties who placed the calls are agents of Allstate;

g)  Whether Allstate ratified the conduct of any third-parties who placed the calls;

h)  Whether Defendant is liable for the calls and/or other acts and omissions of any third-parties who placed the calls; and

i)  Whether the Plaintiff and the class members are entitled to statutory damages and/or injunctive relief because of Defendant's actions.

98.     Plaintiff's claims are typical of the claims of class members.  Plaintiff's claims, like the claims of the classes, arise out of the same common course of conduct by Defendant and its agents, and are based on the same legal and remedial theories.

99.     Plaintiff is an adequate representative of the classes because his interests do not conflict with the interests of the classes, he will fairly and adequately protect the interests of the classes, and he is represented by counsel skilled and experienced in class actions.

100.    Common questions of law and fact predominate over questions affecting only individual class members.  The only individual question concerns identification of class members, which are readily identifiable from records maintained by Defendant, its agents, the National Do Not Call Registry, and others.

101.    Management of these claims is likely to present significantly fewer difficulties than

15

248003

are presented in many class claims because Allstate, its agencies and the lead generators have records of the class at issue. Class treatment is superior to multiple individual suits or piecemeal litigation because it conserves judicial resources, promotes consistency and efficiency of adjudication, provides a forum for small claimants, and deters illegal activities. There will be no significant difficulty in the management of this case as a class action.

102. The likelihood that individual members of the classes will prosecute separate actions is remote due to the time and expense necessary to prosecute an individual case.

103. Defendant has acted and failed to act on grounds generally applicable to Plaintiff and the other members of the classes, thereby making final injunctive relief and corresponding declaratory relief appropriate with respect to the classes as a whole. Prosecution of separate actions by individual members of the putative lasses, should they even realize that their rights have been violated, would likely create the risk of inconsistent or varying adjudications with respect to individual members of the classes that would establish incompatible standards of conduct.

## <u>COUNT I</u>

**Solicitations to Numbers on the National Do Not Call Registry**

104. Plaintiff and the Do Not Call Registry class members re-allege and incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

105. It is a violation of the TCPA for any person or entity to initiate any telephone solicitation to a residential or cellular number registered on the National Do Not Call Registry. *See* 47 C.F.R. § 64.1200(c)(2); *id.* at § 64.1200(e).

106. Defendant and/or others acting on Defendant's behalf made two or more telephone solicitation calls to Plaintiff's and the putative class members' residential telephone numbers that were registered on the National Do Not Call Registry for more than 31 days prior to the calls.

248003

107. Plaintiff and members of the putative Class have received more than one telephone call made by or on behalf of Defendant within a twelve (12) month period in violation of the regulations set forth in 47 C.F.R. § 64.1200.

108. As a result of Defendant's conduct and pursuant to 47 U.S.C. § 227(c)(5) of the TCPA, Plaintiff and the other members of the putative Class were harmed and are each entitled to up to $500.00 in damages for each violation and up to $1,500 in statutory damages for each willfully or knowingly made violation. Plaintiff and the class are also entitled to an injunction against future calls.

## COUNT TWO

**Solicitations After a Stop Request**

109. Plaintiff and Stope Request class members re-allege and incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

110. Defendant violated 47 U.S.C. § 227(c) and the FCC's regulation at 47 C.F.R. § 64.1200(d)(3) by failing to institute procedures necessary to honor do-not-call requests and by placing telemarketing calls to Plaintiff and the class's residential phone numbers after receipt of a do-not-call request.

111. As a result of Defendant's violations, Plaintiff and the Class are entitled to an award of $500 in statutory damages for each and every violation of the statute, or up to $1,500 in statutory damages for each willfully or knowingly made violation, pursuant to 47 U.S.C. § 227(b)(3).

248003

**WHEREFORE**, Plaintiff Ronald Kaplove, on behalf of himself and the other members of the classes, prays for the following relief:

a)      A declaration that Defendant's practices described herein violate the Telephone Consumer Protection Act, 47 U.S.C. § 227;

b)      An injunction prohibiting Defendant from initiating, or accepting leads generated by others initiating, telephone solicitations to persons who have registered their telephone numbers with the National Do Not Call Registry;

c)      An award of actual damages;

d)      An award of statutory damages for Plaintiff and each Class member in the amount up to $500.00 for each and every call that violated the DNC provision of the TCPA and $500 for each call after a stop request;

e)      An award of treble damages, as provided by statute, of up to $1,500.00 for Plaintiff and each Class member for each and every call that willfully and/or knowingly violated the TCPA;

f)      An order certifying this action to be a class action pursuant to the Federal Rules of Civil Procedure 23, establishing the appropriate Class and any Subclasses the Court deems appropriate, finding that Plaintiff is an adequate representative of the Class, and appointing the lawyers and law firms representing Plaintiff as counsel for the Class.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff, individually and on behalf of all others similarly situated, demands a trial by jury on all issues so triable.

18

248003

Dated: April 2, 2026

Respectfully Submitted,

RONALD KAPLOVE, individually and on behalf of all others similarly situated,

By: /s/ Keith J. Keogh

Theodore H. Kuyper
Keith J. Keogh
KEOGH LAW, LTD.
55 W. Monroe Street, Suite 3390
Chicago, Illinois 60603
(312) 726-1092
(312) 726-1093 (fax)
keith@keoghlaw.com
tkuyper@keoghlaw.com

***Attorneys for Plaintiff and the Putative Class***

19

248003